Filed 9/29/15  In re Nataly N. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re NATALY N., a Person Coming Under the Juvenile Court Law. | B261127 (Los Angeles County Super. Ct. No. DK06040) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSUE N., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Stephen Marpet, Juvenile Court Referee.  Affirmed.

_____

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

_____

Josue N. (father) appeals from the order entered after the juvenile court declared his daughter, Nataly N., a dependent of the court under Welfare and Institutions Code section 300, subdivisions (a), (b) and (e)[1], and declined to provide him reunification services based on section 361.5, subdivisions (b)(5) and (b)(6). Father does not challenge the jurisdictional findings under section 300, subdivisions (a) and (b), but contends substantial evidence does not support the jurisdictional finding under section 300, subdivision (e). He also contends that the court erred by denying him reunification services. We affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Section 300 Petitions*

On June 18, 2014, the Department of Children and Family Services (DCFS) received a referral alleging physical abuse of the child by father. "The caller reported that she is very concerned for the 3 month old female child, in the custody of the father . . . . The child is left in the care of the father while the mother goes to work. The child cries and the father grabs her by her face and covers her mouth with his hands to stop the child from crying. The child has marks and bruises on her face. The caller believes that the father is hitting the child but . . . has not seen him hit the child. The child is always crying. The caller stated that about a month and a half ago the mother left the father because of domestic violence. The mother came back and the father sent the mother to work. The father reports to the mother that the child accidentally fell. The mother believes the father. The father is very aggressive and the caller is concerned that he will seriously hurt the child."

Later that day, a social worker and police officer visited the home of the paternal great aunt, where the child had resided with her parents for the last 22 days after the parents were evicted from a former residence. The paternal great aunt was caring for the child while the parents were at work. According to the paternal great aunt, she was out of

---

[1] Statutory references are to the Welfare and Institutions Code.

town the preceding weekend and, "upon her return, from what she was told by father is that he was taking care of the child on Saturday and per father, the child had fallen from the bouncer." The paternal great aunt "denied any concerns of domestic violence" as well as witnessing father "squeez[e] the child from her cheeks or . . . cover[] the baby from her mouth to stay quiet." The social worker observed "bruising on [the] child's left cheek[], redness under her eyes, and a small bruise on the right side of her chin. [The social worker] observed this bruise to be [fading] however . . . still very visible. [The social worker] observed this bruising to be circular . . . [and] did not notice any linear marks. [The social worker] further observed a very small bruise . . . appear[ing] to be about half an inch on child's right chin." The paternal great aunt signed a safety plan to supervise and monitor the child until the social worker could interview the parents.

The following day, the social worker returned with two police officers to the paternal great aunt's home and met with father, who "denied that he has ever put his hand on his daughter's face to prevent her from crying. Father stated that he loves his daughter and would not do anything to harm the child. Father stated that the child . . . sustained the bruising on her cheeks due to hi[s] caring on Saturday and child had fallen from her bouncer. Father showed [the social worker] and the officers the bouncer. Father stated that they went to the laundry room and that is when the child had fallen. . . . Father stated that he was washing at a laundry mat in Anaheim and had the child . . . in the bouncer. Father stated that he had put child's bouncer on the floor however did not buckle the child. Father stated that as he was drying his clothes and folding a load, he heard his daughter crying. Father stated that when he turned, he noticed that child had turn[ed] from the side and hit herself on the corner of the drying machine. Father stated that he picked her up and calmed her down[;] however child would [not] stop and continued to cry. . . . Father stated that [he did not buckle the child because] he just did not think something like that would happen. Father further stated that his daughter moves a lot. . . . Father denied that he has ever held his daughter from her mouth. Father stated that he and mother usually play with the baby by squeezing her cheeks or kissing her[;] however they have never tried to harm the child in any way. . . . Father stated that they did not

3

believe it was necessary for the child to receive medical attention. [The social worker] questioned [as] to the amount of days that child has had the bruise and they still felt child did not need medical attention. Father stated that this is their first daughter and did not think anything bad of it. Father stated that it was an accident and further stated that his daughter just has delicate sensitive skin."

"Father denied [any domestic violence]. . . . Father stated that they were evicted from their other home and indicated that when they got evicted, they did separate[;] however it was due to financial reasons and not due to domestic violence. Further, father explained that mother's family never liked him and they had so many problems due to mother's family always being 'intrometida' (nosey). Father stated that his aunt then did them the favor of having them stay at the home and so they reunited. . . . [The paternal great aunt] is the only babysitter that they have when they go to work. Father further indicated that child has had that bruise since the child injured herself on Saturday, 06/14/2014. . . . [F]ather stated '[child] is an angry baby.' . . . [He] stated that if the baby cries for something, she gets frustrated and will not stop crying even if they are to give her what she wants. [The social worker] asked if he has ever felt frustrated with his daughter[;] however father denied."

Mother, interviewed separately, "denied that she has ever seen father covering the child['s] . . . mouth to prevent her from crying. Mother reported that child is father's 'light.' Mother stated that the reason that child has a bruise on her cheek is due to her hav[ing] gone to work as they needed her only[;] therefore father stayed caring for the child. Mother reported that when she returned, she did notice that child had sustained some bruising on her cheeks. Mother reported that from what father told her is that child had fallen from the bouncer. Mother stated that she did not think anything of it as it appeared to be an accident. Mother stated that father had told her that he did not buckle her and that is why she fell. Mother denied that she had sought medical attention for the baby and stated that she did not believe she needed to take her in. [The social worker] asked mother that the injury that child . . . sustained appears to be forced and does not appear to be that of a fall. Mother did not comment and stated that father had told her

4

what happened and so she thought it was the way father said. Mother stated that this is their first daughter and did not think she had to take child to the doctor. . . . Mother denied any incidents of domestic violence . . . ."

At an officer's request, mother put the child in the bouncer. The social worker and officers "observed that child would swing her hand and kick[;] however child did not appear to push herself up nor to the side. [The social worker] observed that child s[i]nks in this bouncer and no possible way that child could have turned and fallen." One officer "stated that he does not believe that the child sustained the injury the way father is explaining it due to the child being too young to turn to the side."

During a physical examination of the child on June 19, a nurse practitioner observed blunt force trauma on the child's left side of her face. A doctor who examined the child opined that the injuries to her face given her age were not consistent with father's story of her falling from a bouncer. Father was arrested but then released.

On June 24, DCFS filed a section 300 petition against mother and father alleging under subdivisions (a) and (b) that "[o]n 06/19/2014, the three month old child . . . was medically examined and found to be suffering a detrimental condition consisting of a circular bruise to the child's cheek and a bruise to the child's chin. The child's mother['s] . . . and the child's father['s] . . . explanation[s] of the manner in which the child sustained the child's injuries [are] inconsistent with the child's injuries. The child's injuries are consistent with non accidental trauma. Such injuries would not ordinarily occur except as a result of deliberate, unreasonable and neglectful acts by the parents who had care, custody and control of the child. Such unreasonable and neglectful acts on the part of the parents to the child endangers the child's physical health, safety and well-being, creates a detrimental home environment, and places the child at risk of physical harm, damage, and danger." The petition further alleged under subdivision (b) that "[o]n 06/19/2014, the three month old child . . . was medically examined and found to be suffering a detrimental condition consisting of a circular bruise to the child's cheek and a bruise to the child's chin. The child's mother . . . and the child's father . . . medically neglected the child by failing to seek timely medical attention for the child's injuries for

5

five days. Such medical neglect of the child on the part of the parents endangers the child's physical health and safety, and places the child at risk of physical harm, damage, danger and medical neglect."

At a detention hearing, also on June 24, the juvenile court found a prima facie case for detaining the child from father's care and placed her in protective custody with an order to DCFS to release the child to mother once it confirmed that father had moved out of the family home. The court ordered family maintenance services and monitored visitation for father with mother not to serve as the monitor.

Later that day, DCFS received the results of a skeletal survey taken of the child at her June 19 examination. The survey "showed an old fracture of the right seventh posterior rib, as well as a suggested . . . fracture deformity of the left first rib . . . ." The doctor who reviewed the survey indicated that "in her opinion, the right seventh rib fracture can be anywhere from 7-10 days old and the 'suggested' fracture on the left side is . . . more than likely a healed fracture and is quite older." When confronted with the survey results, father said the child had never fallen, but he and mother "did not react, they did not seem surprised, their affect remained flat and father stated that perhaps the fractures occurred when mother gave birth . . . ." A June 25 report from the doctor stated that "[t]he skeletal survey revealed a healing right seventh posterior rib fracture and a possible fracture deformity of the left first rib. . . . [¶] . . . Rib fractures are caused by a large compressive force to the chest. The rib fracture is healing and occurred at least 7-10 days prior to the x-ray. In the absence of a history of major trauma, such as a car accident or a fall from great height, rib fractures are very specific for physical abuse. The birth history did not include any risk factors for obtaining rib fractures with the delivery, such as a large size of the baby or requiring instrumentation during the delivery. The history of a fall from a bouncer onto the corner of a dryer is not consistent with bruising to both sides of the face as well as a rib fracture. In summary, [the child's] injuries are diagnostic of child physical abuse." (Emphasis omitted.) On June 25, based on the results of the skeletal survey, the juvenile court, at DCFS's request, detained the child

6

from mother, as well as father, and DCFS placed the child in foster care. The court ordered monitor visitation for mother as it had for father.

On August 4, DCFS filed an amended section 300 petition, adding the allegation under subdivisions (b) and (e) that, "[o]n 07/[]3/2014, the three month old child . . . was medically examined and found to be suffering a detrimental condition consisting of a healing right seventh posterior rib fracture and a left first rib fracture. The child's mother[']s . . . and the child's father[']s . . . explanation[s] of the manner in which the child sustained the . . . injuries [are] inconsistent with the child's injuries. The child's injuries are consistent with non accidental trauma. Such injuries would not ordinarily occur except as a result of deliberate, unreasonable and neglectful acts by the parents who had care, custody and control of the child. Such unreasonable and neglectful acts on the part of the parents to the child endangers the child's physical health, safety and well-being, creates a detrimental home environment, and places the child at risk of physical harm, damage, and danger."

2.    *Jurisdiction and Disposition*

The August 4 jurisdiction and disposition report included a summary of an interview with mother in which she stated that she was willing to leave father if he had injured the child. Father said he did not believe the child had rib fractures because she did not cry, even though he had reported earlier in the proceedings that the child was an angry baby and cried a lot. He suggested that a paternal great aunt—not the one with whom the family had been staying—might have caused the child's injuries because the child had been in her care a few days before the social worker contacted them. The detective investigating the criminal aspect of the case said that charges would not be filed against father because "'there is no person that is willing to be a witness to the actual abuse of the child . . . [a]lthough it is quite obvious by the medical evidence and the fact that the father was caring for [the child] that the injuries occurred while she was in father's care and that father is abusing [the] child . . . .'"

7

According to the report, DCFS did not recommend family reunification services for mother and father "due to the medical evidence that indicated that the child . . . was severely physically abused. [Father] admitted to being the only caregiver of child . . . during the time period the child . . . sustained the bruising to her face[;] however, the parent[]s have been unwilling to disclose how [the child] sustained her two rib fractures. As stated by [the doctor], [the child] has evidence of fractures that in the absence of a history of major trauma such as a car accident or a fall from great height the injuries are very specific for physical abuse. The parents have no reasonable explanation for the injuries. Reunification with parents is not in the best interest of the child . . . as it is unlikely that any treatment programs could ameliorate or ensure that the parents would not cause further injuries to the child . . . . Neither one of the parents is taking responsibility for the child's injuries and failed to take the child . . . to the doctor when the child had visible bruising on her cheeks and clearly one of them is causing these injuries to [the] child . . . . It is highly unlikely that counseling and parenting is going to teach either parent to confess and learn from harming a child. The parent[s'] actions may further be an indication of possible domestic violence issues that both parents are not willing to address."

DCFS attached to the report a letter from the doctor who had examined the child. A repeat skeletal survey was performed on the child on July 3, which "showed further healing of the right seventh posterior rib fracture and a left first rib fracture. This skeletal survey confirmed the presence of a left first rib fracture. Both fractures were estimated to be 1-2 weeks to 6 weeks in age on the original skeletal survey taken on 06/19/14. . . . [¶] The finding of the additional left first rib fracture continues to support my interpretation of [the child's] clinical findings. In summary, [the child's] multiple injuries, the facial bruising and rib fractures, are diagnostic of child physical abuse." (Emphasis omitted.)

A November 7 interim review report indicated that, since August 21, mother and father had been participating in parenting classes, individual counseling and anger management. They also visited with the child on a regular basis. Mother "[wa]s cooperating in her interaction in group is appropriate. She has disclosed the issue of her

case during her individual counseling sessions. She will continue to attend her sessions as required . . . ." Father also "[wa]s cooperating in his interaction in group is appropriate. He has disclosed the issue of his case during his individual counseling sessions. . . . [¶] He will continue to attend his sessions as required . . . ." Mother informed the social worker that she wanted to terminate her relationship with father "as she was the only one working and paying the bills but also stated it was difficult as she (mother) works nights and father is her form of transportation." DCFS continued to recommend no reunification services to mother or father because "[t]here are many concerns . . . surrounding [father's] statements and mother's unwillingness to disclose possible relationship issues that place [the] child . . . in danger. Clearly both parents have been less than forthcoming about how [the] child . . . sustained her injuries and there appears to be a lack of empathy and insight on both parents['] part to ensure the safety and appropriate medical care of [the] child . . . ."

A December 12 interim review report indicated that mother had decided to separate from father because he is controlling and aggressive. Father tried to prevent mother from seeing the child without him. Father said he no longer was attending his program because "his employment is scarce." Father thought the family was "being targeted and [he] has never seen the x-rays and doesn't believe the injuries." DCFS continued to recommend no reunification services for father but changed its recommendation as to mother for reunification services to include individual counseling addressing "domestic violence, child abuse and protection, co-dependency, family history."

At the jurisdiction and disposition hearing, the juvenile court sustained the allegations of the petition. According to the court, "I've read the entire file and there's medical evidence to substantiate the severe medical injuries sustained by a three-month-old child that could not have happened and occurred unless it was done nonaccidentally; therefore, based upon the evidence before me, I'm finding by a preponderance of the evidence that the petition is sustained as it's been pled in its entirety [under section 300, subdivisions (a), (b) and (e)]."

9

As to disposition, the juvenile court ordered that the child continue in her placement. It granted father monitored visitation, not to be monitored by the mother and not to take place in the family home or with mother present. It denied father reunification services, stating, "With regard to the disposition, pursuant to [section] 361.5[,] subsection (b), I'm finding that the father, also under the evidence before me, was the primary caretaker of this child and that the injuries occurred during his handling of the child and, therefore, reunification services under the statute indicates they need not be provided to a parent described in this section when the court finds by clear and convincing evidence that the child was brought within the jurisdiction of the court under subsection (e) of the 300 statute because of the conduct of the parent. And the court finds by clear and convincing evidence that this child sustained these injuries while under the care and custody of [father]. In addition, that the child has been adjudicated under the 300 section for severe infliction of severe physical harm to the child and the court makes a factual finding that it would not benefit the child to pursue reunification services with the father in this case as there is no competent evidence to—testimony that the services would likely prevent re-abuse or continued neglect of the child, or that failure to try reunification services would be detrimental to the child because of the child's close and positive[] attach[ment] to that parent. . . . The court is making that finding by clear and convincing evidence as to both subsections (5) and (6) of the Welfare and Institutions Code, and, therefore, ordering no family reunification services and it's based on my finding that by clear and convincing evidence of all of the facts in the petition."

Father timely appealed. (§ 395, subd. (a)(1); see *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112 [jurisdictional findings reviewable on appeal from dispositional order]; *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391, 1395 [denial of reunification services at disposition appealable as part of dispositional order].)[2]

---

[2] Mother did not appeal and thus is not a party to this matter. The order therefore remains intact as to mother.

10

**DISCUSSION**

1.     *Jurisdictional Finding Under Section 300, Subdivision (e)*

"The purpose of section 300 is 'to identify those children over whom the juvenile court may exercise its jurisdiction and adjudge dependents.' [Citation.]" (*In re A.O.* (2010) 185 Cal.App.4th 103, 110.) To determine that a child is one described by section 300, the juvenile court must find by a preponderance of the evidence that the allegation in the petition is true. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318; see § 355, subd. (a).) We review findings under section 300 for substantial evidence and will affirm the dispositional order based on those findings if they are supported by reasonable, credible evidence of solid value. (*Matthew S.*, at p. 1319.)

The juvenile court may adjudge a child a dependent of the court under section 300, subdivision (e), when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent . . . . For the purposes of this subdivision, 'severe physical abuse' means any of the following: "any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness . . . ." Father contends the evidence is not sufficient to support the finding under section 300, subdivision (e), that the child suffered severe physical abuse as defined by the statute.[3] We disagree.

The section 300, subdivision (e), allegation provided that "[o]n 7/[]3/2014, the three month old child . . . was medically examined and found to be suffering a detrimental condition consisting of a healing right seventh posterior rib fracture and a left first rib fracture." The two rib fractures are not severe injuries so as to fall under the single act provision of section 300, subdivision (e). No evidence suggests that, "if left untreated, [they] would [have] cause[d] permanent physical disfigurement, permanent physical disability, or death." (§ 300, subd. (e).) Nevertheless, the evidence is sufficient

---

[3]     Father does not challenge the jurisdictional findings under section 300, subdivisions (a) and (b).

to support the juvenile court's implied finding that the rib fractures occurred on different occasions and thus were caused by more than one act of physical abuse. The rib fractures were at different stages of healing. The doctor's initial evaluation indicated that the right seventh posterior rib fracture was healing as of June 19, the date of the child's first skeletal survey, and occurred at least seven to 10 days earlier. The other fracture on the left side initially was diagnosed as a suspected fracture, and later confirmed by a repeat skeletal survey, and was thought to be farther along in the healing process and "quite older." Based on these results, substantial evidence supports a finding of severe physical injury within the meaning of section 300, subdivision (e).[4]

In addition, contrary to Father's contention, the evidence sufficiently supports the finding that he was the perpetrator of the rib fractures. Father routinely was the primary caregiver for the child when only mother was working or otherwise out of the home. Father said the child had never fallen in a manner that would cause rib fractures, yet when confronted with the information about the fractures he and mother "did not react, they did not seem surprised, their affect remained flat . . . ." Father tried to blame the fractures on birth trauma and then on a paternal great aunt but also told DCFS that he did not believe the child had rib fractures, despite the medical evidence that identified the fractures. Although DCFS did not include the bruises to the child as part of the section 300, subdivision (e), allegation, the fact that the child suffered them while in father's care supports the conclusion that he also caused the rib fractures. Father admitted the bruising occurred while the child was in his care. Father's statement that the bruising was caused by the child falling from a bouncer was rejected by a social worker, police officer, nurse practitioner and doctor—all of whom believed the child, only three months old, could not have obtained the injuries in the manner described by father. All maintained that the bruising was a sign of physical abuse. Father described the child as

---

[4] The child also suffered two bruises on her face. But the evidence does not demonstrate that the bruising was deep bruising as required by section 300, subdivision (e), and, in any case, DCFS did not include the bruising in its subdivision (e) allegation in the petition so as to support a jurisdictional finding under that provision.

12

angry. The bruises appeared to be due to a person forcefully placing a hand over the child's mouth, suggesting that father was trying to stop the baby from crying. The doctor opined that the two rib fractures, as well as the bruising, were "diagnostic of child physical abuse" and that the rib fractures were not inflicted at the same time. (Emphasis omitted.) Father's propensity to use inappropriate force to stop the baby from crying reasonably supports the conclusion that he used inappropriate force on other occasions causing the rib fractures.

2. *Denial of Reunification Services*

The juvenile court denied Father reunification services under section 361.5, subdivisions (b)(5) and (b)(6). Father contends the denial was improper. We disagree.

Under section 361.5, subdivision (b)(5), reunification services need not be provided to a parent when the court finds by clear and convincing evidence "[t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent . . . ." (§ 361.5, subd. (b)(5).) For purposes of section 361.5, subdivision (b)(5), "the court shall not order reunification . . . unless it finds that, based on competent testimony, those services are likely to prevent reabuse . . . of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent. The social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification services is likely to be detrimental to the child." (§ 361.5, subd. (c).)

The evidence described above, including father's propensity to use force with the child, supports the court's finding by clear and convincing evidence that jurisdiction over the child was proper under section 300, subdivision (e), because of father's conduct. Based on that finding, the court could offer father reunification services only if it affirmatively concluded, based on competent testimony, that the services were likely to prevent reabuse of the child or that failure to attempt reunification would be detrimental to the child because of a close and positive attachment to father. The social worker's

13

evaluation indicated that services likely would not prevent reabuse. Father was denying the abuse; he admitted the bruising occurred while he was caring for the child but gave an account that none of the professionals who saw the child believed was possible; he did not seek medical attention for the child; he participated in programs during the dependency proceedings for only a short while and stopped by the time of disposition; and he gave conflicting explanations for the rib fractures, even denying their existence. Moreover, given the child was only three months old at the time of detention, father had not yet created a close and positive relationship with the child such that the denial of reunification services would be detrimental to her. On this record, the court did not err by denying father reunification services under section 361.5, subdivision (b)(5).

Although the juvenile court's denial of reunification services under section 361.5, subdivision (b)(5) withstands scrutiny, we note that its denial under section 361.5, subdivision (b)(6), does not. As to section 361.5, subdivision (b)(6), the court may decline to provide reunification services when it finds by clear and convincing evidence "[t]hat the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child . . . by a parent . . . as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent . . . ." "[T]he infliction of severe physical harm . . . may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent . . . ." (§ 361.5, subd. (b)(6).) For purposes of section 361.5, subdivision (b)(6), the court shall not order reunification services unless it "finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c).) "The court shall read into the record the basis for a finding of . . . severe physical harm under paragraph (6) of subdivision (b), and shall also specify the factual findings used to determine that the provision of reunification services to the offending parent . . . would not benefit the child." (§ 361.5, subd. (k).)

14

The juvenile court in denying reunification services under section 361.5, subdivision (b)(6), did not state the basis for its finding of severe physical harm or specify the factual findings used to determine that offering father reunification services would not benefit the child. (See *In re Rebekah R.* (1994) 27 Cal.App.4th 1638, 1651 [§ 361.5 requires "on-the-record finding of . . . severe physical harm . . . in addition to an appropriate express finding concerning the lack of benefit to the child"].) The court simply recited the words of section 361.5, subdivision (b)(5), and stated that it was basing its denial under both subdivisions (b)(5) and (b)(6) on a "finding . . . by clear and convincing evidence of all of the facts in the petition." But the petition stated facts related only to the child's injuries and their infliction by father. The petition did not address any potential benefit to the child from offering father reunification services. Thus, although the denial of reunification services was proper under section 361.5, subdivision (b)(5), the court's statement on the record does not support the denial under section 361.5, subdivision (b)(6).

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


LUI, J.